383 F.3d 1058
 Darla MOTLEY; Juan Jamerson, Plaintiffs-Appellants,
v.
Bernard PARKS; Daryl Gates; Gerald Chaleff; Herbert Boeckman; T. Warren Jackson; Robert M. Talcott; Raymond C. Fisher; Guadalupe Sanchez; Gregory Kading; Al Ruegg; James Black; Lawrence Webster; Dean Hansell, Defendants-Appellees.
 No. 02-56648.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 11, 2004.
 Filed September 21, 2004.
 
 COPYRIGHT MATERIAL OMITTED Stephen Yagman, Marion R. Yagman, Joseph Reichmann, Kathryn S. Bloomfield, Yagman & Yagman & Reichmann, for plaintiffs-appellants Darla Motley and Juan Jamerson.
 Rockard J. Delgadillo, Los Angeles City Attorney and Janet G. Bogigian, Los Angeles Deputy City Attorney for defendants-appellees Bernard Parks, Daryl Gates, Gregory Kading, and Albert Ruegg.
 Robert F. Helfand, Elizabeth A. Keech, Deputy Attorneys General, State of California for defendant-appellee Guadalupe Sanchez.
 David Pinchas, Assistant United States Attorney for defendants-appellees James Black and Larry Webster.
 Appeal from the United States District Court for the Central District of California, Margaret M. Morrow, District Judge, Presiding. D.C. No.CV-00-01472-MMM.
 Before: B. FLETCHER, PREGERSON, and BRUNETTI, Circuit Judges.
 BETTY B. FLETCHER, Circuit Judge:
 
 
 1
 Darla Motley brings this 42 U.S.C. § 1983 action on behalf of herself and her infant son Juan Jamerson, claiming that the defendants unlawfully searched her home and used excessive force against her infant son. The defendants-appellees are Albert Ruegg, Gregory Kading, Daryl Gates, and Bernard Parks of the Los Angeles Police Department (LAPD); Guadalupe Sanchez, a California Parole Officer; and James Black and Larry Webster, who are federal Bureau of Alcohol, Tobacco, and Firearms (ATF) agents (collectively, "the officers"). The officers claim qualified immunity for their actions, and Motley appeals from two district court orders granting summary judgment on that basis. We reverse the district court's grant of qualified immunity to Ruegg, Sanchez, Kading, and Black on the search and excessive force claims. We affirm the grant of summary judgment to Webster, Gates, and Parks.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 Janae Jamerson, a member of the Four Trey Crips gang, was released on parole on February 20, 1998, but was rearrested on February 3, 1999. On March 18, 1999, while Jamerson was in custody, LAPD supervisor Ruegg held a briefing for LAPD officers, federal ATF officers, and state parole officers regarding ten planned searches of parolees' residences in the Newton Street area. Jamerson's last known residence was on the list. The officers admit they had no reasonable suspicion to believe that Jamerson was involved in any crime; they were simply searching parolees as a way to "clean up" the Newton Street neighborhood.
 
 
 3
 The address information for the searches may have been compiled as early as November 1998, while the search took place in March 1999. Jamerson's in-custody status was listed on the state parole system, and Jamerson's parole officer knew he was in custody, but none of the officers assigned to conduct a parole search of Jamerson's last known residence checked to see if he was in custody on March 18, 1999.
 
 
 4
 At 10:00 or 10:30 that morning, four officers from the various agencies went to search what was allegedly Jamerson's residence. James Black and Larry Webster, the two ATF officers, went behind the house, and Parole Officer Guadalupe Sanchez and LAPD officer Gregory Kading went to the front door. One of the officers knocked on the door, and awakened Motley, Jamerson's girlfriend, who was asleep with their infant son, Juan Jamerson. Black joined Kading and Sanchez at the front of the house as soon as Motley answered the door.[1]
 
 
 5
 Motley testified that when she came to the door in her pajamas, Kading identified himself as an LAPD officer, said that he was there with Jamerson's parole officer, and asserted that they had a warrant to search the apartment. In fact, the officers had no warrant, and Jamerson's parole officer was neither present nor even aware of the planned search. Motley told the searching officers that Jamerson did not live there and that he was in custody.[2] One of the officers told Motley that Jamerson had been released three days earlier. Motley countered that she knew Jamerson was still in custody. The searching officers asked who was inside with her, and Motley replied that only she and her five-week-old son were at home. Kading told Motley that if she did not let them in, they would arrest her and put her baby in foster care. Once the searching officers threatened to place her son in foster care, Motley unlocked the security gate. Kading pushed her against the door and out of his way as he went into the house.[3]
 
 
 6
 The searching officers went into the apartment with their guns drawn, and Sanchez, the parole officer, stayed in the living room while Kading and Black searched the apartment. Motley testified that during the search, the officers were "going through things," including closets and a file box, and that they "pulled out" a lot of things.
 
 
 7
 Before the officers searched the bedrooms, Motley told the officers that her son was in the back bedroom. When Kading entered this bedroom, he pointed his gun at Motley's baby, who was on his back on the bed, looking toward the bedroom door. When Motley heard her five-week-old son start screaming, she ran into the room, where Kading was still pointing the gun at the baby. According to Motley, Kading kept his gun trained on the baby while he searched the room, and only put his gun away when another officer came in and helped him examine a box at the foot of the bed. Motley testified that the search of this bedroom alone took twenty minutes.
 
 
 8
 During the officers' search of the apartment, Motley called Rasheed Davis, Jamerson's brother, and told Davis that the officers had threatened her and were searching her home. She asked Davis to come over to help her, and he arrived as the searching officers were leaving.[4]
 
 
 9
 The officers appeared to be mocking Motley during the search. One of the officers asked to whom the baby belonged, and when Motley told them that Janae Jamerson was the baby's father, the officers laughed at her. While searching one of the rooms, Kading asked where "that really nice ping pong table" was, as though he wanted to take Motley's things. As the officers were leaving, Kading shouted that Motley should "let them know that Newton Street had been here."
 
 
 10
 After the officers left, Motley called Jamerson's parole officer, Ms. Smith, and told her that officers had come and searched her entire home. Ms. Smith stated that she did not authorize the search and confirmed that Jamerson was still in custody. A few weeks after the search of her residence, Motley moved to San Pedro, because she was afraid to stay in the Newton Street area with her son.
 
 
 11
 Motley, on behalf of herself and her son Juan, filed a § 1983 action alleging that the officers violated their Fourth Amendment rights, used excessive force, conspired to violate their Fourth Amendment and equal protection rights, and that the law enforcement agencies were liable for the officers' actions under Monell v. Dep't of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The district court granted summary judgment on all claims. Motley argues on appeal that the officers were not entitled to qualified immunity for the unlawful search, the use of excessive force against her infant son, and the Monell claims against Gates and Parks.
 
 ANALYSIS
 
 12
 We review de novo the district court's decision regarding qualified immunity. Mena v. City of Simi Valley, 332 F.3d 1255, 1261 n. 2 (9th Cir.2003). Where material issues of fact are disputed, we "assume that the version of the facts asserted by the non-moving party is correct." Bingham v. City of Manhattan Beach, 341 F.3d 939, 942 (9th Cir.2003); see also Schwenk v. Hartford, 204 F.3d 1187, 1193 n. 3 (9th Cir.2000).
 
 
 13
 To determine whether law enforcement officers are entitled to qualified immunity, we first ask whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If we determine that there is a constitutional violation, we then examine whether the constitutional right was clearly established, such that a reasonable officer would have been aware that he was acting unlawfully. Id. at 202, 121 S.Ct. 2151. Although the inquiry into what is "clearly established" must be decided with reference to the specific situation the officers confronted, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (noting that the Supreme Court has expressly rejected a requirement that the facts of previous cases be fundamentally or even materially similar).
 
 
 14
 I. Fourth Amendment Violation: Unconstitutional Search
 
 
 15
 "The Fourth Amendment's touchstone is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." United States v. Knights, 534 U.S. 112, 118-19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (citing Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). As the Supreme Court recently reiterated: "Because the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment, our cases have firmly established the basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Groh v. Ramirez, 540 U.S. 551, 124 S.Ct. 1284, 1291, 157 L.Ed.2d 1068 (2004) (internal quotation marks omitted) (quoting Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) and Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).
 
 
 16
 The officers in this case set out to conduct a parole search. Instead, assuming that Motley's account is true, the officers used duress to gain access to the home of an innocent mother and her baby and conducted a warrantless search in a harassing manner. It is clear that if no parolee lived at Motley's residence at the time of the search, the search violated Motley's Fourth Amendment right to be free from warrantless searches. Cf. Steagald v. United States, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (holding that officers could not enter and search the house of a third party simply because they had a "reasonable ... belief" that the subject of an arrest warrant was a guest there; they had to have evidence that he was a co-resident); Perez v. Simmons, 884 F.2d 1136, 1141 (9th Cir.1988) ("It may be true that if [the subject of an arrest warrant's] Fourth Amendment rights were at issue, [his sister's] apartment might be considered his `residence,' even though it was a very temporary place of occupancy. But it simply does not follow that, when analyzing [his sister's] constitutional rights, [her brother] must be considered a co-resident just because he spent the night there on occasion.").
 
 
 17
 The less stringent Fourth Amendment requirements for a parole search are the only justification the officers here have offered for why this search was constitutional. However, Jamerson had been incarcerated for six weeks at the time of the search, and Motley testified that her apartment was no longer Jamerson's residence. Without requiring a close temporal connection between a parolee and the residence to be searched, officers would have carte blanche to search, without probable cause, any place where a parolee used to live. Eventually, as in this case, these searches would not affect the incarcerated "parolee" at all, only violate the privacy of the people he left behind.
 
 
 18
 The dissent asserts that we previously have held constitutional parole searches that took place after the parolee was incarcerated, as though those cases support the constitutionality of the search of Motley's home. However, in each of the cases he cites, the parole search took place the same day as the arrest, and the officers had at least reasonable suspicion that the parolee's home contained contraband. United States v. Dally, 606 F.2d 861, 863 (9th Cir.1979) (upholding parole search where the parolee was arrested just outside the house and right afterward, the officers searched the house); Latta v. Fitzharris, 521 F.2d 246, 247 (9th Cir.1975) (upholding parole search where officers arrested parolee away from his residence with marijuana in his possession, then went to his house and found more marijuana); United States v. Jones, 152 F.3d 680, 683, 686-87 (7th Cir.1998) (upholding the search of a parolee's home the day he was arrested because the officers had reasonable grounds to believe that cocaine and firearms were located inside). In Dally, Latta, and Jones, the parole searches were directly related to the arrest of the parolee. These holdings do not alter the fact that it is unconstitutional for officers to search a person's home without a warrant simply because a parolee used to live there.
 
 
 19
 Finally, the purpose of allowing parole searches without a warrant is "to assure that the [parole] serves as a period of genuine rehabilitation and that the community is not harmed by the [parolee's] being at large." Griffin v. Wisconsin, 483 U.S. 868, 875, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). When the parolee is no longer "at large" and the search no longer affects his interests, both of these justifications are absent. Construing the facts in her favor, Motley has established that the officers violated her Fourth Amendment right to be free of warrantless searches.
 
 
 20
 II. Violation of Clearly Established Law: Unconstitutional Search
 
 
 21
 The officers assert that because they reasonably believed they were conducting a parole search of Jamerson's residence, they are entitled to qualified immunity. It is true that a parolee subject to a search condition has a diminished expectation of privacy, and therefore the Supreme Court has held that "[w]hen an officer has reasonable suspicion that a [parolee]... is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Knights, 534 U.S. at 121, 122 S.Ct. 587. However, even assuming that the officers could conduct a constitutionally-acceptable parole search without reasonable suspicion of criminal activity,[5] the warrantless search of Motley's home was unconstitutional for two reasons: first, the officers did not have reasonable grounds to believe that Jamerson lived or was present at Motley's residence, and second, the searching officers conducted the search in an unreasonable and harassing manner.
 
 
 22
 A. Reasonable Grounds to Believe that Jamerson Lived with Motley
 
 
 23
 To execute an arrest warrant inside a particular residence, law enforcement officers must have reason to believe that the person to be arrested lives at the address to be searched. United States v. Gorman, 314 F.3d 1105, 1111 (9th Cir.2002) (equating "reasonable belief" standard with "probable cause"). The same standard applies to the determination of whether a parolee is a resident in a specific home, as required before officers can conduct a parole search. See United States v. Harper, 928 F.2d 894, 896 (9th Cir.1991) (requiring probable cause that parolee lived at a certain address before entering the home and executing arrest warrant issued for parole violations); Dally, 606 F.2d at 863 (requiring a reason to believe that parolee lived at a certain residence before conducting parole search). Before Gorman, we had not phrased the applicable standard consistently: some cases stated that officers had to have "probable cause" that a parolee lived at the residence, and other cases stated that the officers needed a "reasonable belief" that it was the parolee's residence. The Gorman court held that the two standards required the same, "substantial" evidence of residence. Id. at 1113 (quoting Watts v. County of Sacramento, 256 F.3d 886, 890 (9th Cir.2001), and holding that the probable cause test applied to the execution of an arrest warrant at the suspect's girlfriend's house).
 
 
 24
 Although we did not explicitly equate the "reasonable belief" standard with probable cause until 2002, it was clear when the officers searched Motley's home in 1999 that substantial evidence of residence was required. In 1991, we held that the police may only execute an arrest warrant issued by the parole board for a parole violation inside a home "if the [officers] have probable cause to believe the person named in the warrant resides there." Harper, 928 F.2d at 896.[6] Harper cited with approval the 1979 holding in Dally, 606 F.2d at 863, that police were entitled to search a home because there was sufficient evidence to support a reasonable belief that the parolee lived there. Id.; see also Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (articulating reasonable belief standard: "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within").
 
 
 25
 The difference between the "reasonable belief" language in Dally and the "probable cause" language in Harper caused confusion in our Circuit, because some judges interpreted "reasonable belief" to be equivalent to "reasonable suspicion." See United States v. Conway, 122 F.3d 841, 844 (9th Cir.1997) (Wallace, J., concurring) (noting apparent conflict between "reasonable basis" standard in Dally and "probable cause" standard in the more recent Harper case); United States v. Watts, 67 F.3d 790, 795 (9th Cir.1995) (same), overruled on other grounds, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). However, despite the confusion about how to interpret "reason to believe," the cases decided before 1999 which discussed the reasonable belief standard clearly required evidence more substantial than a reasonable suspicion that the suspect or parolee lived at a given residence. See, e.g., Watts, 256 F.3d at 890 (collecting cases and concluding that courts "have generally required substantial evidence pointing to the suspect's co-resident status to create a reasonable belief that he lives in the home of a third party"); Gorman, 314 F.3d at 1113-14. In addition, Harper was never overruled, which arguably put reasonable officers in 1999 on notice that they were required to have probable cause that a parolee lived at a certain address before searching it.
 
 
 26
 Regardless of how the standard was expressed, we have found no Ninth Circuit case in which the Court equated "reason to believe" with "reasonable suspicion" and held that a parole search was constitutional where officers had only a reasonable suspicion that the parolee lived at the address. For example, in Dally, which the dissent implies is the only Ninth Circuit case on point, the officers had the following evidence that the parolee, Holiday, lived at the residence they later searched: (1) a federal agent who was also investigating Holiday informed the parole officer that Holiday was living at the address; (2) during a stake-out, officers photographed Holiday taking out the trash, bringing in his laundry, and chatting with the neighbors; (3) a week later, officers returned to find Holiday's car parked near the house with fogged windows, indicating it had been parked overnight; (4) the next day, Holiday left the house in the morning and got in a car that had been parked overnight; (5) Holiday returned with dry cleaning, changed his clothes, and left the house again, carrying laundry; and (6) Holiday later returned with more dry cleaning, and officers observed him use a key to open the door. Dally, 606 F.2d at 862. For these reasons, it was clearly established in 1999 that before conducting a parole search, officers had to have substantial evidence that a parolee lived at the residence to be searched.
 
 
 27
 The question, then, is whether based on substantial, trustworthy evidence, a reasonable officer would have believed that Jamerson resided at Motley's apartment. The officers involved had different knowledge and levels of responsibility: Ruegg supervised the search team; Kading, Sanchez, and Black conducted the search, and Webster was an agent in training who remained behind the house during the search.
 
 1. Supervisor Ruegg
 
 28
 Ruegg was responsible for compiling information on the parolees to be searched. He had been collecting information on parolees since November 1998 — over four months before the search of Motley's home — the time when the Newton Street Station started a new "Career Criminal Unit." The only function of the Career Criminal Unit was to conduct parole searches of Newton Street residents. Although Ruegg testified that he did not himself compile the address information of parolees, he had reason to know that the parolee information was stale.
 
 
 29
 Further, Ruegg organized and supervised the search team. A supervisor can be liable under section 1983 if he "set[s] in motion a series of acts by others ..., which he knew or reasonably should have known, would cause others to inflict the constitutional injury." Graves v. City of Coeur D'Alene, 339 F.3d 828, 848 (9th Cir.2003) (citing Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir.1991), and holding that the liability of the superior officer was an issue for the jury). "Supervisory liability may be found in civil rights actions even if the supervisors in question are not directly involved in the acts leading to the constitutional deprivation. Because there is no dispute that the officers were directly responsible for supervising the search, a jury could properly hold them liable." Mena, 332 F.3d at 1270 n. 19 (citing Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.1991) (en banc)). Of particular importance here, officers supervising a search are responsible for making sure that the search is supported by the proper cause. "The officers who lead the team that executes a warrant are responsible for ensuring that they have lawful authority for their actions.... The leaders of [a search] expedition may not simply assume that the warrant authorizes the search and seizure." Ramirez v. Butte-Silver Bow County, 298 F.3d 1022, 1027 (9th Cir.2002), aff'd by Groh, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).
 
 
 30
 Just as a warrant must be supported by probable cause, in March 1999 it was clearly established that officers must have reason to believe that a parolee lives at a certain address; without the requisite cause, the officers cannot constitutionally conduct a parole search. As the supervisor in charge of the search, Ruegg was responsible for ensuring that the searching officers had that substantial evidence. Instead, Ruegg delegated the task of checking Jamerson's parole status to some unnamed person at least six weeks before the search took place. Ruegg then relied on the stale information, without using any of three easily available methods of checking Jamerson's parole status on or anytime near the day of the search.[7] Ruegg admitted he knew that parolees did not always live at the addresses they listed when they were first released, [ER 166] yet he did not even contact Jamerson's parole officer to obtain any current information about where Jamerson actually lived. In short, Ruegg dispatched officers to conduct a parole search without any evidence that Jamerson was connected to a specific criminal activity and without sufficient evidence to support probable cause, let alone a reasonable suspicion that Jamerson lived at the given address at the time of the search.
 
 
 31
 Under these circumstances, as the supervisor of the Unit and the search in question, it was not reasonable for Ruegg to simply assume that the information about Jamerson was accurate. See Ramirez, 298 F.3d at 1027. We therefore reverse the district court's determination that Ruegg was entitled to qualified immunity for his role in the search.
 
 
 32
 2. Searching Officers: Kading, Sanchez, and Black
 
 
 33
 At the time of the search, the officers who conducted the search had the following information about Jamerson's residence and parole status: at the LAPD briefing, they were informed that Jamerson was on parole and that his last known address was 416 East 40th Place. However, when they arrived at Motley's residence, she told them that Jamerson did not live there and that he was incarcerated. Other than Kading,[8] none of the officers had any independent information that Jamerson lived at the address to be searched. Nor did any of them attempt to confirm the information they were given, even after one of the searching officers lied to Motley, saying Jamerson had been released, and even after Motley emphatically repeated that she knew Jamerson was in custody.
 
 
 34
 "It is incumbent on the officer[s] executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." Groh, 124 S.Ct. at 1293. The Groh Court emphasized that unless there are exigent circumstances, officers are required to carefully ensure that constitutional requirements are met when searching a person's residence, and are not entitled to qualified immunity when they do not. Id. at 1294 n. 9. The same care, if not more, must be taken when the officers are searching without a warrant, under an exception to the warrant requirement.
 
 
 35
 The searching officers' responsibilities include a duty to conduct a reasonable investigation: "Although a police officer is entitled to rely on information obtained from fellow law enforcement officers, ... this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts." Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1293 n. 16 (9th Cir.1999) (citation omitted); cf. United States v. Kyllo, 37 F.3d 526, 529 (9th Cir.1994) ("Furthermore, the fact that [the officer] relied on information received from another law enforcement officer does not ipso facto mean that [he was] not reckless."); Fuller v. M.G. Jewelry, 950 F.2d 1437, 1444 (9th Cir.1991) (noting that in some circumstances, officers have a duty to investigate further when they obtain additional information at the scene of a crime); Merriman v. Walton, 856 F.2d 1333, 1335 (9th Cir.1988) (holding that even though an initial report that a suspect had committed a kidnapping might have established probable cause, the officer received exculpatory information before arresting the suspect, and a reasonable officer would have investigated further before making the arrest).
 
 
 36
 Here, the searching officers did not know whether the parolees' addresses were current; in fact, it appears that they had no information about the searches except the names and last known addresses of the parolees. Several of the officers testified that the purpose of the parole "searches" was to determine if they had current addresses for the parolees, not to force entry and search the homes, because they did not have even reasonable suspicion that the parolees were involved in criminal activity. Given this purpose, and knowing the residence information they had was not necessarily current, a reasonable officer would have called to check Jamerson's parole status once Motley stated with certainty that Jamerson was in jail.
 
 
 37
 Instead, the searching officers lied to Motley about Jamerson's parole officer being present, their possession of a search warrant, and Jamerson's custody status. In Harper, we held that the following facts about a parolee's residence "barely" constituted probable cause: the parolee's family leased the house and two of his brothers lived there; the parolee had lived with his family before his incarceration; a source told the officers the parolee lived there; the police conducted repeated surveillance and saw the parolee enter the house with his own key once or twice; and several of the parolee's known associates had their cars parked outside the home. Harper, 928 F.2d at 896-97. Here, the searching officers had an outdated address and a resident who twice asserted that the parolee was in custody and did not live there. We recognize that law enforcement officers cannot always believe what citizens tell them. However, here, there were no exigent circumstances, the officers had no reasonable suspicion that Jamerson was involved in criminal activity, and Motley told them unequivocally that Jamerson was in custody, even in the face of the officers' lies. The officers had only been given Jamerson's name and last known address and they knew the information might not be current because of the transient nature of parolees. Once Motley informed them that Jamerson did not live there, all the officers would have had to do is make one phone call to determine whether Jamerson was in custody. They did not. If Motley's testimony is true, it was not reasonable for the searching officers to believe that Jamerson lived in Motley's home.
 
 3. Agent Webster
 
 38
 Webster was an officer in training and did not participate in the search of Motley's home. He was behind the house with Black when the other officers approached the door, and remained behind the house even when Motley came to the door and Black went to the front. Webster's actions were reasonable under the circumstances, and we affirm the district court's grant of summary judgment in his favor.
 
 
 39
 B. Parole Search Conducted in a Harassing Manner
 
 
 40
 Even if the officers had substantial reason to believe that Jamerson lived in Motley's home, Kading, Sanchez, and Black would be liable for violating Motley's Fourth Amendment rights, because they conducted — or allowed the search to be conducted — in an unconstitutional manner. It has long been clear that a parole search is unreasonable under the Fourth Amendment if it is conducted in a harassing manner. See United States v. Consuelo-Gonzalez, 521 F.2d 259, 265 (9th Cir.1975) (en banc) (holding that a "probationer, like the parolee, has the right to enjoy a significant degree of privacy," which is infringed when a parole search is "intimidating and harassing"); Latta v. Fitzharris, 521 F.2d 246, 252 (9th Cir.1975) (en banc) ("In a given case, what is done may be so unreasonable as to require that the search be held to violate the Fourth Amendment. For example, harassment or intimidation is no part of a parole officer's job."); see also People v. Reyes, 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968 P.2d 445, 450 (Cal.1998) (noting that a parole search is not reasonable under the Fourth Amendment if it is "arbitrary, capricious or harassing"); People v. Bravo, 43 Cal.3d 600, 238 Cal.Rptr. 282, 738 P.2d 336, 340 (1987) ("[O]fficers cannot act arbitrarily or capriciously or harass a probationer....").
 
 
 41
 In some parole search cases before 2001, courts held that a parole search was unreasonable under the Fourth Amendment because it was conducted for an improper or harassing purpose that did not serve the interests of parole or probation supervision. See, e.g., United States v. Johnson, 722 F.2d 525, 527-28 (9th Cir.1983). However, in 2001, the Supreme Court abrogated Johnson and other cases containing similar reasoning, stating that "[w]ith the limited exception of some special needs and administrative search cases, `we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers.'" Knights, 534 U.S. at 122, 122 S.Ct. 587 (quoting Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)) (internal citations omitted). Because the prohibition in Knights only prevents courts from relying on searching officers' subjective intent to harass when assessing the reasonableness of a search under the Fourth Amendment, it is clear that courts must still hold that a parole search is unreasonable if conducted in a harassing manner.[9] This was clearly established in 1999, and is still the law today.[10]
 
 
 42
 The officers who searched Motley's residence for purported parolee Janae Jamerson conducted the search in a harassing manner. When Motley came to the door in her pajamas, the officers told her several falsehoods. Kading said that he was there with Jamerson's parole officer and that they had a warrant to search the apartment, neither of which was true. Motley told the searching officers that Jamerson did not live there and was in custody. One of the officers then told her that Jamerson had been released three days earlier, another lie. When the officers then asked Motley who else was inside the house with her, she said that only she and her five-week-old son were there. Kading told Motley that if she did not let them in, they would arrest her and put her son in foster care. Faced with Kading's threat to take her son away, Motley unlocked the security gate. Kading pushed her out of the way and against the wall with his forearm as he went into the house. The officers all entered the apartment with their guns drawn. During the search, the officers were "going through things," including closets and a file box, a search that was completely unauthorized.
 
 
 43
 Kading knew that the baby was in the back bedroom, and as soon as he entered that room he pointed his gun directly at the five-week-old infant. The baby was on his back on the bed looking toward the bedroom door. The baby began screaming as soon as Kading entered, and so Motley ran to the room, where Kading was still pointing the gun at the baby. Kading did not move his gun when Motley entered, and he kept it pointed at Motley's tiny son while he searched the room.
 
 
 44
 The officers searched for over twenty minutes when it could have been ascertained much more quickly that Jamerson was not present.
 
 
 45
 During the course of the search, they questioned Motley about her baby's father and laughed at her when she revealed that it was Jamerson. The officers appeared to ogle the belongings in the two-bedroom apartment: Kading inquired about the whereabouts of "that really nice ping pong table." Even though the officers found neither Jamerson nor contraband, for which they had no authority to search, one of them felt it necessary to issue a parting threat: "Tell them that Newton Street was here." The searching officers showed no respect for Motley, her baby, her home, or her privacy. They lied to her, shoved her, made fun of her, and pointed a gun at her five-week-old baby.
 
 
 46
 Of the four officers who went to Motley's apartment, only Webster never entered the home. Each of the other officers either participated in harassing and intimidating Motley and her child during the search, or failed to intervene to stop the harassment. See United States v. Koon, 34 F.3d 1416, 1447 n. 25 (9th Cir.1994) ("[A]n officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights."); Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir.1995) (holding that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" when another official acts unconstitutionally); O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."). If Motley's testimony is true, any reasonable officer would have known that this search was harassing and unreasonable under the Fourth Amendment. See Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (holding that officers not entitled to qualified immunity if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). Kading, Black, and Sanchez are not entitled to qualified immunity for the unconstitutional search of Motley's home.
 
 
 47
 III. Qualified Immunity for Use of Excessive Force
 
 
 48
 Additionally, we reverse the district court's grant of qualified immunity to Kading on the excessive force claim. Use of a weapon against someone who is helpless constitutes excessive force. Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1130 (9th Cir.2002). Pointing a gun at a person's head can constitute excessive force. See Robinson v. Solano County, 278 F.3d 1007, 1014-15 (9th Cir.2002) (en banc) (handcuffing and pointing a gun at misdemeanor suspect was excessive force where he posed no threat to officers and crime was not serious). Most importantly, in 1999, no reasonable officer could have believed that pointing a gun at a child, particularly a five-week-old baby, was reasonable during the course of a non-exigent (and unconstitutional) search. See McDonald by McDonald v. Haskins, 966 F.2d 292, 294 (7th Cir.1992) (holding a gun to the head of a child during search of the child's residence constituted excessive force and officer was not entitled to qualified immunity despite the fact that no previous case law specifically established the unreasonableness of such an egregious act). Officer Kading is not entitled to qualified immunity for pointing a deadly weapon at a tiny infant.
 
 IV. Monell Claims
 
 49
 We agree with the district court that Motley has not presented evidence sufficient to establish Monell liability for her excessive force and unconstitutional search claims. We therefore affirm the dismissal of her claims against former LAPD police chiefs Parks and Gates.
 
 CONCLUSION
 
 50
 We reverse the district court's decision that Kading, Black, Sanchez, and Ruegg are entitled to qualified immunity. We affirm the district court's grant of summary judgment to Parks, Gates, and Webster. We also affirm the district court's decision on the Monell claims. Appellants are entitled to costs.
 
 
 51
 REVERSED IN PART; AFFIRMED IN PART.
 
 
 
 Notes:
 
 
 [1]
 As Black, Kading, and Sanchez were the only officers who participated in the search of Motley's home, they are referred to as the "searching officers" throughout
 
 
 [2]
 She also testified that "everything" was in her name, that she paid all the rent and all the bills and that soon after the search she and her son moved, without Jamerson
 
 
 [3]
 The searching officers dispute Motley's account of their verbal exchange on her doorstep. Sanchez testified that Motley did tell them that Jamerson was not there, but that she voluntarily said, "Go ahead. Look yourself," and let the officers into the apartment. However, we recite Motley's version of the facts because for purposes of summary judgment we must take the facts in the light most favorable to the non-movant
 
 
 [4]
 Sanchez testified that Davis was already there when the officers arrived
 
 
 [5]
 The officers admit that they did not have reasonable suspicion that Jamerson was involved in criminal activity, but assert that reasonable suspicion is not necessary before conducting a parole search. The Court inKnights left an open question about whether reasonable suspicion of criminal activity is required before conducting a parole search. Knights, 534 U.S. at 121, 122 S.Ct. 587. This case illustrates the questionable justification for instructing officers to conduct completely suspicionless parole searches. Here, Ruegg's unit assumed that any rise in crime was caused by parolees, and planned to search all parolees's homes in a particular neighborhood, without consulting a particular parolee's parole officer to learn about that parolee's status or behavior on parole. Neighborhood residents understandably saw the searches as harassment.
 However, we need not decide whether reasonable suspicion of criminal activity is required, because the search was not a parole search and was unreasonable under the Fourth Amendment: the officers did not have reasonable grounds to believe that Jamerson lived at Motley's home, and the search was conducted in a harassing manner.
 
 
 [6]
 The dissent makes much of the fact that inHarper, the searching officers had a warrant for the arrest of the parolee, based on parole violations, and here, the only possible legal justification for the search was Jamerson's parole status. The dissent relies on a distinction without a difference: in both circumstances, the officers have legal justification to search a house only if the parolee resides there. The difference is merely factual, and the qualified immunity standard does not require that a constitutional principle be clearly established in every factual context before officers can be held liable for violating it. See Hope, 536 U.S. at 741, 122 S.Ct. 2508. Even if there were any logical doubt that the same standard applied in both contexts, Harper resolved it by relying on Dally, a parole search case, in determining the level of suspicion officers had to have that the subject of the arrest warrant (a parolee) lived at the residence to be searched. Harper, 928 F.2d at 896.
 
 
 [7]
 Ruegg testified that there were three ways to check the status of a parolee: (1) check the computerized parole records, to which both LAPD and parole officers had access; (2) check the records room at the state parole office; and (3) call the parolee's parole officer. It is undisputed that Jamerson's parole officer knew he was in custody, and that his in-custody status was listed on the computerized parole system
 
 
 [8]
 Kading testified that he had been to that address before and seen Jamerson there, and knew that Jamerson had been on parole. However, Kading testified that he did not know whether that address was Jamerson's residence. Further, there is no evidence that he told the other officers about his previous experience at the residenceSee United States v. Del Vizo, 918 F.2d 821, 826 (9th Cir.1990) ("When there has been communication among agents, probable cause can rest upon the investigating agents' `collective knowledge.'") (citing United States v. Bernard, 623 F.2d 551, 560-61 (9th Cir.1979)).
 
 
 [9]
 Knights also ended a line of cases holding that only parole officers could conduct parole searches, and not for the purpose of conducting general criminal investigations. See United States v. Stokes, 292 F.3d 964, 967 (9th Cir.2002) (discussing the manner in which Knights changed the law); United States v. Ooley, 116 F.3d 370, 372 (9th Cir.1997), overruled in part by Knights, 534 U.S. at 122, 122 S.Ct. 587. The search of Motley's home took place before Knights was decided, which possibly explains why the searching officers lied to Motley about what they thought was the required presence of Jamerson's parole officer: to obfuscate the real purpose for the search, which was a purely general criminal investigation.
 
 
 [10]
 We hold thatKnights did not affect the continuing validity of the rule that parole searches conducted in a harassing manner are unreasonable. However, even if Knights appeared to muddy the applicability of this rule, it was not decided until 2001, two years after the search here occurred. In 1999, there was no doubt that it was unreasonable for police officers to conduct a parole search in a harassing manner.
 
 
 BRUNETTI, Circuit Judge, dissenting:
 
 52
 It is well settled that a police officer is entitled to qualified immunity unless the facts alleged demonstrate that the officer's conduct violated a clearly established constitutional right and that the officer did not make a reasonable mistake of law or fact. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Rude-busch v. Hughes, 313 F.3d 506, 514 (9th Cir.2002). Because on the date the officers entered Darla Motley's apartment, Officer Albert Ruegg's, Special Agent James Black's and Parole Agent Guadalupe Sanchez's alleged actions were not clearly established to be constitutional violations, I respectfully dissent.
 
 
 53
 * Standard Governing Summary Judgment Motions
 
 
 54
 Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).
 
 
 55
 We have noted that "[w]here disputed facts exists ... we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct." Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir.2001). Accordingly, we evaluate Appellees' claims of qualified immunity by resolving all factual disputes in Darla Motley's favor. Id.
 
 II
 Facts and Proceedings Below
 
 56
 On March 18, 1999, Los Angeles Police Department officer Gregory Kading ("Kading"), California State parole agent Guadalupe Sanchez ("Sanchez"), and Federal Bureau of Alcohol, Tobacco and Firearms agents Larry Webster ("Webster") and James Black ("Black") were assigned to a joint task force in Los Angeles to assist the California Department of Corrections in conducting parole searches. During a morning briefing by Los Angeles Police Department detective Al Ruegg ("Ruegg"), this team of four was told they were to make contact with about ten parolees to see if the parolees were complying with the terms of their release. Detective Ruegg told them that these contacts should be "non-confrontational" and that they should try to gain consent to enter the residence if they had no additional information that the parolee resided at the location.
 
 
 57
 During the morning briefing, Agent Black was given a list of the parolees to be contacted and their addresses. The list was compiled by an officer at the direction of Ruegg. Ruegg, however, did not verify the accuracy of the list, nor could he remember the specific officer to whom he delegated the task. No member of the four-person search team compiled the list or confirmed the parole statuses or addresses of the people named.
 
 
 58
 Janae Jamerson ("Jamerson"), a reputed member of a Los Angeles street gang, was one of the individuals named on the search team's list. Jamerson had been released on parole on February 20, 1998, and as a condition of his release Jamerson agreed that he, his residence, and any property under his control could be searched at any time without a warrant, and with or without probable cause, by an agent of the California Department of Corrections or any peace officer. The search team's list noted Jamerson's residence as 416 E. 40th Place in Los Angeles. One member of the search team, Officer Kading, knew Jamerson and independently believed he was on parole and residing at the 40th Place address. Later investigation revealed, however, that Jamerson had resided at the 40th Place address until February 3, 1999, when he was arrested and incarcerated on a parole violation.
 
 
 59
 Between 10:00 and 10:30 in the morning, Sanchez, Kading, Black and Webster arrived at 416 E. 40th Place to speak with Jamerson. Officer Kading and Agent Sanchez went to the front of the house while Agents Black and Webster walked to the rear. Darla Motley ("Motley"), Jamerson's girlfriend who was living in the apartment, alleges that she was awakened that morning by a hard knock at her door. When she answered the knock, Officer Kading allegedly told her that he and fellow officers were conducting a parole search on her boyfriend, Jamerson. Motley responded that Jamerson was not there, he was in jail, and that she wouldn't allow the officers into her apartment. Motley alleges that after she refused the officers entry, Kading told her that if she did not allow them access, the officers would arrest her and put her son in foster care. Reluctantly, Motley allowed the officers to search her apartment. It was at about this time that Agent Black came around from the back of the house and heard Motley give her consent. Motley testified at her deposition that upon entering the apartment, Kading pushed her out of the way with his forearm.
 
 
 60
 After the officers had entered the house, Agent Webster walked to the front of the apartment and saw the front door open. He realized that the other officers had entered the apartment and concluded that they had been granted permission to enter.
 
 
 61
 Once inside, Kading and Black began searching the apartment while Sanchez and Webster stood just inside the door. Neither Sanchez nor Webster said anything to Motley and neither searched the apartment. After searching one bedroom of the apartment, Officer Kading moved to a second bedroom where Motley and Jamerson's five-week-old son was lying on his back. Motley alleges that upon entering the room Kading pointed his gun at the infant. Motley said that Kading then called Black to assist in searching the second bedroom. Motley testified that the search of this second room took twenty minutes.
 
 
 62
 Motley testified in her deposition that at no time was she or her son handcuffed and at no time was she or her son frisked. The only time Motley said she could not freely move about her residence was when the officers first entered the residence and motioned for her to stay where she was.
 
 
 63
 Upon leaving the residence, Kading told Motley, "Let Judy know that [Los Angeles Police] Newton Street[Division] had been here." Judy is parolee Jamerson's mother. Motley stated that she just thought the officer was "being funny" when he said that to her.
 
 
 64
 Motley filed a 42 U.S.C. § 1983 action on behalf of herself and her son, alleging that the officers violated their Fourth Amendment and equal protection rights, used excessive force, conspired to violate their Fourth Amendment and equal protection rights, and that the law enforcement agencies were liable under Monell v. Dep't of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The district court granted summary judgment on all claims, concluding in part that the officers were entitled to qualified immunity because the officers alleged actions were not clearly established constitutional violations on the date of the search. Motley appealed, arguing the district court erred in finding the officers' actions were not clearly established constitutional violations in 1999 and in dismissing her Monell claim.
 
 III
 Qualified Immunity
 
 65
 In Saucier v. Katz, the Supreme Court established a two-step framework courts must follow when determining whether officers are entitled to a qualified immunity defense. 533 U.S. at 201-06, 121 S.Ct. 2151. First, a court must ask whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." Id. at 201, 121 S.Ct. 2151. If the plaintiff can demonstrate that a constitutional violation had occurred, "the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a general proposition." Id. The appropriate inquiry for qualified immunity purposes is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. 2151. The Supreme Court has stressed that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The qualified immunity defense "encompasses both mistakes of facts and mistakes of law." Rude-busch, 313 F.3d at 514.
 
 IV
 Defendants Black, Webster, and Sanchez
 A. Constitutional Violation
 
 66
 To determine if officers are entitled to qualified immunity this court must first ascertain whether the officers committed a constitutional violation when they searched Motley's residence. Saucier, 533 U.S. at 201-206, 121 S.Ct. 2151. While the majority concludes defendants Sanchez, Black, and Kading committed a constitutional violation when they searched Motley's residence, I include defendant Webster in the discussion below because I view his qualifiedly immune actions as analogous to those of Agents Black and Sanchez.
 
 
 67
 As an initial matter, I note that the majority correctly assumes that officers can conduct a constitutionally acceptable parole search without reasonable suspicion the parolee has participated in criminal activity. Indeed, four members of this court recently concluded that permitting parole searches without any suspicion of criminal activity is not arbitrary, not capricious, not harassing, and not unreasonable. United States v. Crawford, 372 F.3d 1048, 1063 (9th Cir.2004) (en banc) (Trott, J., concurring). Moreover, just one year before the officers sought out Jamerson for a parole search, the California Supreme Court held that "[w]hen involuntary search conditions are properly imposed [on parolees], reasonable suspicion is no longer a prerequisite to conducting a search of the subject's person or property." People v. Reyes, 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968 P.2d 445, 450 (1998) (emphasis added). The California court continued, "[b]ecause of society's interest both in assuring the parolee corrects his behavior and in protecting its citizens against dangerous criminals, a search pursuant to a parole condition, without reasonable suspicion, does not `intrude on a reasonable expectation of privacy, that is, an expectation that society is willing to recognize as legitimate.'" Id. at 449 (citations omitted) (emphasis in original).
 
 
 68
 But while the majority correctly assumes that officers can conduct a parole search without reasonable suspicion that the parolee has participated in criminal activity, it erroneously concludes that Sanchez, Kading, and Black are not entitled to qualified immunity because they violated Motley's constitutional rights by searching 416 E. 40th Place without probable cause to believe that Jamerson was residing at the location and that Sanchez and Black are not entitled to qualified immunity because they violated Motley's constitutional rights by conducting, or failing to prevent others from conducting, the search in a harassing manner.
 
 
 69
 1. Reasonable Basis to Believe Jamerson Resided in the Apartment
 
 
 70
 While it is generally true that a search of a home must be accompanied by a warrant, law enforcement does not need a warrant when conducting a reasonable parole search. Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). We have held that police may conduct a parole search of a residence if the officers have "a reasonable basis for the belief" that the parolee lives at a particular residence. United States v. Dally, 606 F.2d 861, 863 (9th Cir.1979); see also United States v. Davis, 932 F.2d 752, 758-60 (9th Cir.1991) (items may be searched if there is "reasonable suspicion" that it is within the ownership, possession, or control of the probationer). We have also held that this right to search a parolee's home does not necessarily end once a parolee is incarcerated. Latta v. Fitzharris, 521 F.2d 246, 247 (9th Cir.1975); Dally, 606 F.2d at 863 (holding that the parolee's "arrest for a parole violation did not end the need for a parole search"); United States v. Jones, 152 F.3d 680, 686-87 (7th Cir.1998) (upholding warrantless parole search of a parolee's residence when it was known that he was in custody).
 
 
 71
 Here, the uncontroverted facts demonstrate that when the officers received instruction during the morning briefing they had "a reasonable basis for the belief" that Jamerson lived at the location. First, Jamerson informed law enforcement that the apartment the officers searched was his residence. And second, on at least one prior occasion, Officer Kading had made contact with Jamerson at the residence. Moreover, even when Motley told the officers that Jamerson no longer lived at the residence they were still reasonable in their belief that Jamerson resided at the location. See Ramirez v. Butte-Silver Bow County, 298 F.3d 1022, 1027 (9th Cir.2002) (holding that officers who are not supervising a search are entitled to rely on the reliable word of other officers regarding the basis of the search).
 
 
 72
 The majority, by contrast, concludes that Sanchez and Black violated Motley's Fourth Amendment rights because they conducted a parole search of the residence without probable cause that Jamerson lived at the location. The two cases the majority cites for support are unpersuasive in the parole search context. Neither United States v. Gorman, 314 F.3d 1105 (9th Cir.2002), nor United States v. Harper, 928 F.2d 894 (9th Cir.1991), involved parole searches. In fact, both addressed whether police can serve an arrest warrant at a specific residence. In Gorman, we decided that police must have probable cause to believe that a person for whom police have an arrest warrant is living at a residence before executing the warrant. 314 F.3d at 1111-15. Similarly, United States v. Harper involved an arrest warrant that authorized police to enter the defendant's house. 928 F.2d 894, 896 (9th Cir.1991). If this is the level of suspicion the majority is establishing for parole searches for this circuit today, then it appears that Sanchez, Black, Webster, and Kading may have violated Motley's Fourth Amendment rights. However, because the majority is only articulating this standard in 2004, as I explain below, the defendants are entitled to qualified immunity for those actions taken in 1999. See Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
 
 
 73
 a. The Law Was Not Clearly Established That Officers Needed Probable Cause
 
 
 74
 An officer is immune from § 1983 liability if the constitutional violation upon which the claim is based was not "clearly established" at the time the official took action. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Accordingly, even if the majority's conclusion is correct that officers need probable cause to believe that a parolee resides at a location before conducting a parole search, and that the defendants did not have the requisite probable cause, the defendants are still entitled to qualified immunity if their actions were not clearly established to be a constitutional violation on March 18, 1999. After reviewing our caselaw in this area, I find that contrary to the majority's assertion, it was not clearly established in 1999 that officials needed probable cause to believe a parolee resides at a specific location before conducting a parole search. In fact, even today the requisite level of suspicion officers must have that a parolee resides at a location before conducting a parole search may not be clearly established.
 
 
 75
 The majority's confusion is understandable. Over the last twenty-five years our court has created confusion by not defining terms and by supporting some of our opinions with contradicting caselaw. The roots of this confusion date back to 1979 when we held that officers must have "a reasonable basis for the belief" that the parolee lives at a particular residence before officers can conduct a reasonable parole search of a residence. Dally, 606 F.2d at 863. Unfortunately, we never defined what we meant by "reasonable basis for the belief."
 
 
 76
 The following year the Supreme Court held that officers can execute an arrest warrant at a dwelling "when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Besides the obvious difference in language the two courts used, Payton is also distinguishable from Dally in that in Payton the Supreme Court addressed the level of suspicion officers must have that the subject of an arrest warrant is at a location as opposed to the level of suspicion officers must have that a parolee is at a location for parole search purposes. Just as we failed to do the year earlier, the Supreme Court neglected to define what was meant by its "reason to believe" language. Payton would not have caused the confusion it has except for the fact that it used similar language to that used in Dally, and the fact that the subject of the arrest warrant was a parolee.
 
 
 77
 Three years after Payton was decided, we held that "[i]f an arrest warrant and reason to believe the person named in the warrant is present are sufficient to protect that person's fourth amendment privacy rights in his own home, they necessarily suffice to protect his privacy rights in the home of another." United States v. Underwood, 717 F.2d 482, 484 (9th Cir.1983) (en banc) (emphasis added). While in Underwood we were correct in relying on the standard established in Payton (because both cases dealt with arrest warrants), we too failed to specifically define the term "reason to believe." Perhaps as a foreshadowing of the confusion that was to come, the Underwood dissent expressed concern that "the majority rule permits searches of any home based only on `a reason to believe' the subject of an arrest warrant is present. The justification for [a] search [subject to an arrest warrant] may thus be made in the field on less than probable cause." Underwood, 717 F.2d at 490 (Skopil, J., dissenting) (emphasis added).
 
 
 78
 Then, in 1991, we briefly addressed this issue, albeit in an immensely confusing way. United States v. Harper, 928 F.2d 894, 896 (9th Cir.1991). In Harper, we found that "police may enter a home with an arrest warrant only if they have probable cause to believe the person named in the warrant resides there." Id. (citing Perez v. Simmons, 900 F.2d 213 (9th Cir.1990), amending 884 F.2d 1136 (9th Cir.1989); Dally, 606 F.2d 861) (emphasis added).
 
 
 79
 While at first glance Harper appears to clarify the confusion in the arrest warrant context, it actually confounded the issue even more because the two cases we cited for support actually contradicted our holding. As previously noted, Dally was a case dealing with parole searches and stated that officers must have "a reasonable basis for the belief" that the parolee is residing at the location to be searched, while in Perez we stated that "if the officers did not have reasonable grounds for believing that Albert resided in the apartment, the search was illegal ..." 900 F.2d at 213.
 
 
 80
 We appeared to first recognize the lack of clarity in our "reason to believe" language, and the confusion it was causing, in United States v. Watts, 67 F.3d 790 (9th Cir.1995) rev'd on other grounds, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). There we noted the "tension among our cases regarding whether a probation search must be supported by probable cause to believe that the probationer resides on the premises or whether a `reasonable' belief will suffice." Id. at 795. We recognized that while we sometimes held that a search is legal if officers have "a reasonable basis for the belief" that a parolee lives at the residence to be searched, other times we held that officers must have probable cause to believe that the subject of an arrest warrant resides on the premises to be searched. Id. Once again, however, we failed to resolve this apparent conflict because we found the officers had probable cause to believe the parolee resided at the location. We also failed to recognize that these two varying standards may be because Dally dealt with parole searches while Harper addressed arrest warrants.
 
 
 81
 The majority makes the unpersuasive argument that because Harper was decided after Dally, Harper's probable cause standard in the arrest warrant context clearly established the level of suspicion required in the parole search context. Indeed, in Watts, we correctly noted this sequence of cases did not eliminate confusion because (1) Harper cited Dally with apparent approval and (2) after we decided Harper we decided United States v. Davis wherein we stated that "[t]he permissible bounds of a probation search are governed by a reasonable suspicion standard." Id. (quoting United States v. Davis, 932 F.2d 752, 758 (9th Cir.1991)). Moreover, just two years after Watts, and two years before the officers went searching for Jamerson, a member of this court again noted the apparent conflict over what was meant by "reason to believe." United States v. Conway, 122 F.3d 841, 844 (9th Cir.1997) (Wallace, J., concurring) (recognizing the conflict between the "reasonable basis" standard in United States v. Dally, 606 F.2d at 861 (9th Cir.1979), and the "probable cause" standard in United States v. Harper, 928 F.2d 894 (9th Cir.1991)).
 
 
 82
 It was not until 2002, a full three years after the officers awoke Motley on the morning of March 18, 1999, and only after we recognized the uncertainty in this area for the third time, that we clarified what was meant by "reason to believe" in the arrest warrant context. In United States v. Gorman, we held that
 
 
 83
 The `reason to believe' standard first espoused by the Supreme Court in Payton v. New York was not defined in Payton or in subsequent cases. Nor have we explicitly defined the `reason to believe' standard. We now hold that the `reason to believe,' or reasonable belief, standard of Payton and Underwood embodies the same standard of reasonableness inherent in probable cause.
 
 
 84
 314 F.3d 1105, 1111 (9th Cir.2002) (citations omitted). We also noted that "the `reason to believe' standard is far from clear." Id. at 1112 (emphasis added). We continued that "[j]ust what [the `reason to believe' standard] means continues to be a matter of considerable uncertainty." Id. at 1112 n. 5 (quoting Wayne R. LaFave, Search and Seizure § 6.1(a) at 226). Our holding in Gorman undoubtedly clarified the level of suspicion officers needed that the subject of a search warrant is located at a specific residence. Gorman, however, did not clarify this issue in the arrest warrant context until 2002, and we have still not clarified the standard required in the parole search context since we noted the confusion in Watts.
 
 
 85
 b. The Agents Were Reasonable
 
 
 86
 But even if the majority is correct that it was clearly established in 1999 that officers must have probable cause to believe that Jamerson resided at 416 E. 40th Place, and that they did not have probable cause, the officers are still entitled to qualified immunity if they were reasonable in believing that they only needed reasonable suspicion that Jamerson resided at the location. Saucier, 533 U.S. at 202, 121 S.Ct. 2151.
 
 
 87
 As discussed above, our court has noted that there was a conflict within our cases over whether officers need reasonable suspicion or probable cause to believe that a subject of an arrest warrant is at a location before executing the warrant. Gorman, 314 F.3d at 1112 (stating that "the `reason to believe' standard is far from clear"); see also Conway, 122 F.2d at 844. We cannot in good conscience hold government officials to a higher standard than we keep for ourselves.
 
 
 88
 The officers were also reasonable in believing that they had at least reasonable suspicion that Jamerson was located at the residence. Members of the search team received a briefing from their supervisor giving them the location of Jamerson's residence. Moreover, one of the officers even knew that location to be Jamerson's residence from personal experience. Officers in this situation are entitled to rely on the statements of their fellow officers so long as those statements are not facially wrong. See Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1292 (9th Cir.1999).
 
 
 89
 The majority's assertion that once Motley told the officers that Jamerson was "in the pen," they were unreasonable in searching the location without conducting further research is contrary to our precedence. Indeed, on numerous occasions we have held that an officer is entitled to rely on information obtained from fellow officers even in the face of contradictory information. Guerra v. Sutton, 783 F.2d 1371, 1375 (9th Cir.1986) ("Law enforcement officers and agencies are entitled to rely on one another to a certain extent.... The system requires reasonable cooperation and division of labor ..."); Baker v. McCollan, 443 U.S. 137, 145-46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); see Choi v. Gaston, 220 F.3d 1010, 1012-13 (9th Cir.2000) ("When CHP officer Brame assumed custody of Choi, the Anaheim officers informed him that they had seen Choi running from the vicinity of the abandoned CHP vehicle. Although this information was inaccurate, Brame had no reason to question the Anaheim officers' statement."); United States v. Bernard, 623 F.2d 551, 561 (9th Cir.1979) (holding that a law enforcement officer is "entitled to rely on observations and knowledge of [other agents] even though some of the critical information had not been communicated to him"); Mendocino Envtl. Ctr., 192 F.3d at 1292 (stating that "a police officer may reasonably rely on a representation by other officers as to the existence of probable cause"). We have also noted that"[w]e do not believe law enforcement officers should in all circumstances be bound by the responses of persons with the greatest incentive to lie about ownership, possession, or control." United States v. Davis, 932 F.2d 752, 760 (9th Cir.1991).
 
 
 90
 The cases the majority cites to support its conclusion of unreasonableness are inapposite. In Fuller v. M.G. Jewelry, 950 F.2d 1437, 1444 (9th Cir.1991), we stated that officers should not rely solely on uncorroborated testimony of a citizen witness before arresting a person. Similarly, in Merriman v. Walton, 856 F.2d 1333 (9th Cir.1988), police received uncorroborated statements from a man claiming that his sister had been kidnaped. After receiving the information, however, police learned (1) that the alleged victim had returned home, (2) the alleged perpetrator was the alleged victim's long-time boyfriend, (3) the alleged perpetrator had called the police and stated that he was available for police questioning, and (4) when approached by police the alleged perpetrator was cooperative and volunteered his version of what happened. Id. at 1335. We concluded that in that situation a reasonable officer would have made further inquiry before effecting a warrantless arrest. Id. Clearly, the facts of those cases where the officers based their actions on uncorroborated statements by citizens despite a mountain of exculpatory evidence, are distinguishable from the facts of this case where the officers acted on information from fellow officers that appeared to be entirely credible and rather routine. To hold, as the majority does, that officers are reasonable only if they investigate everything a person with an incentive to lie to them says would (1) provide an incentive for people to lie to law enforcement and (2) undermine our court's jurisprudence that "law enforcement officers and agencies are entitled to rely on one another to a certain extent." Guerra, 783 F.2d at 1375. None of the defendants violated a clearly established constitutional right in 1999 by searching 416 E. 40th Place without probable cause that Jamerson resided there.
 
 2. Alleged Harassment
 
 91
 The majority rightly notes that it was clear in 1999 that a parole search conducted in a harassing manner is unreasonable under the Fourth Amendment. Latta, 521 F.2d at 252. Contrary to the majority's assertion, however, Motley alleged no facts that Agents Sanchez, Webster or Black conducted the parole search in a harassing manner. Indeed, Motley even stated that on the day the officers came to her door Sanchez said nothing to her and stood next to the door during the entire encounter, while Black said nothing to her and only searched the apartment. Similarly, Webster's actions during the search were apparently so benign that Motley neglected to remember any actions he took. The only person Motley alleges did or said anything in a harassing manner was Kading. The majority even notes that Agents Black and Webster were not present when Kading first made contact with Motley and that neither Sanchez, Webster, nor Black were present when Kading pointed his gun at the five week old baby. The import of these facts is that the majority is not merely holding that conducting a parole search in a harassing manner is a constitutional violation, but that being present when any officer conducts a parole search in a harassing manner is a constitutional violation whether or not one knows of the harassment.
 
 
 92
 a. The Law Was Not Clearly Established
 
 
 93
 Assuming that the majority's holding that all officers present when one officer harasses is a constitutional violation, whether or not an officer knows of the harassment, it was not clearly established in 1999 that such inaction is a constitutional violation. The only case the majority cites to support its claim is Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir.1995). It cites Robins for the proposition that an officer violates a person's constitutional rights when he or she fails to intervene to stop harrassment. The majority's reliance on Robins is misplaced. The facts of Robins are straightforward and are clearly distinguishable from the facts of this case. In Robins, a prisoner sued three correctional officers when one of the officers fired bird shot at Robins's fellow inmate but some of the shot hit Robins. Id. at 1438. The district court dismissed Robins's First, Fourth, Fifth, Sixth, and Fourteenth Amendment claims, but determined that a triable issue of material fact existed as to whether the use of bird shot against Robins's fellow prisoner violated Robins's Eighth Amendment rights. Id. The three guards appealed, arguing that they were entitled to qualified immunity. The two guards who did not fire the bird shot argued that Robins failed to allege sufficient facts that they took any action against either Robins or his fellow prisoner. Id. at 1442. After noting that all three officers were together in the control bubble from where the shooting officer fired, and that one of those two officers played a role in directing the disorderly prisoner to comply, we concluded that all three guards could be found liable for violating Robins's Eighth Amendment rights. We stated that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene." Id. at 1442.
 
 
 94
 In Robins, we did not establish the broad rule that the majority adopts today. Robins can most accurately be understood to mean what we said, "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene." Indeed, in Robins we even noted that Robins himself specifically relied on the Eighth Amendment in his suit. Id. at 1442. To conclude that the defendants are not entitled to qualified immunity because of Robins, effectively undermines the Supreme Court's dictate in Saucier by stretching our court's precedence beyond the bounds of the Robins opinion.
 
 
 95
 Because of the foregoing analysis, I would hold that Agents Sanchez, Webster, and Black are entitled to qualified immunity for their actions.
 
 V
 Defendant Ruegg
 
 96
 It is well established in this circuit that our law does not impose liability on supervising officers under a respondeat superior theory of liability. Rise v. Oregon, 59 F.3d 1556, 1563 (9th Cir.1995). Instead, supervisors can be held liable under § 1983 "only if they play an affirmative part in the alleged deprivation of constitutional rights." Id.; see also Graves v. City of Coeur D'Alene, 339 F.3d 828, 848 (9th Cir.2003). The supervisor must "set in motion a series of acts by others..., which he knew or reasonably should have known, would cause others to inflict the constitutional injury." Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir.1991) (internal quotations omitted).
 
 
 97
 Here, as best I can discern, the majority reverses the district court's grant of Detective Albert Ruegg's summary judgment motion because Ruegg relied on the work of one of his subordinates and sent officers to Jamerson's last known address without verifying his subordinate's work. I find no constitutional violation in Ruegg's actions.
 
 
 98
 None of the facts alleged support the majority's conclusion that Ruegg "set in motion a series of acts by others ..., which he knew or reasonably should have known, would cause others to inflict the constitutional injury" as is required for § 1983 liability. Indeed, all of the facts alleged and presented show that Ruegg instructed the officers he sent on the parole searches to obtain consent before entering a parolee's residence. Moreover, to assist in ensuring entry was obtained only through consent, Ruegg did not provide the officers with any tools to make forced entry. Lastly, Ruegg testified that every officer present at the briefing knew there would be negative consequences, such as an internal affairs complaint initiated by Ruegg himself, if they failed to follow these orders. With these instructions, Ruegg did not set in motion a series of acts which he knew or reasonably should have known would cause officers to inflict a constitutional injury. The district court's grant of Ruegg's summary judgment motion should be affirmed.
 
 VI
 Defendant Kading
 
 99
 I agree with the majority that Officer Kading is not entitled to qualified immunity. Motley has alleged that Kading conducted the search of her apartment in a terrorizing manner by threatening to take her child away from her if she did not consent to the search, by shoving her out of the way with his forearm when he entered the apartment, and by pointing his gun at her baby. Motley also alleges that by pointing his gun at her baby Kading used excessive force.
 
 
 100
 As explained above, I disagree with the majority's assertion that Kading committed a constitutional violation by searching 416 E. 40th Place without probable cause that Jamerson resided at the address. I do, however, agree with the majority's conclusion that, as alleged, Kading (1) conducted the search in a harassing manner and (2) used excessive force when he pointed his gun on the five week old baby.
 
 VII
 Conclusion
 
 101
 Because on the date the officers searched 416 E. 40th Place the officers did not violate a clearly established constitutional right, I respectfully dissent in part and would hold that defendants Sanchez, Webster, Black, and Ruegg are entitled to qualified immunity.